ELIZABETH SEMERZAKIS *v.* COMMISSIONER
OF SOCIAL SERVICES
(SC 17180)
(SC 17181)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued March 9—officially released June 7, 2005

*Hugh Barber*, assistant attorney general, with whom were *Tanya Feliciano DeMattia*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellant in Docket No. SC 17180 (defendant).

*Michael J. Kolosky*, with whom were *Bradford S. Babbitt* and, on the brief, *Linda L. Morkan*, for the appellant in Docket No. SC 17181 (intervening defendant).

*Randi F. Mezzy*, with whom was *Shirley Bergert*, for the appellee in both cases (plaintiff).

*Royal J. Stark* filed a brief for the Center for Children's Advocacy et al. as amici curiae.

*Opinion*

NORCOTT, J. The principal issue in these appeals is whether the orthodontics regulation, § 17-134d-35 (e) of the Regulations of Connecticut State Agencies,[1] is

---

[1] Section 17-134d-35 (e) of the Regulations of Connecticut State Agencies provides: "When an eligible recipient is determined to have a malocclusion, the attending dentist should refer the recipient to a qualified dentist for preliminary examination of the degree of malocclusion.

"(1) The need for orthodontic services shall be determined on the basis of the magnitude of the malocclusion. Accordingly, the 'Preliminary Handicapping Malocclusion Assessment Record,' available from the Department, must be fully completed in accordance with the instructions sections of the form. The Department deems orthodontic services to be medically necessary when a correctly scored total of twenty-four (24) points or greater is calculated from the preliminary assessment. However, if the total score is less than twenty-four (24) points the Department shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures. Other deviations shall be considered to be severe if, left untreated, they would cause irreversible damage to the teeth and underlying structures.

a reasonable utilization control over the provision of orthodontic treatment to individuals receiving medicaid early prevention, screening, diagnosis and treatment (EPSDT) services pursuant to 42 U.S.C. § 1396d (r).[2] The plaintiff, Elizabeth Semerzakis, brought an adminis-

"(2) If the total score is less than twenty-four (24) points the Department shall consider additional information of a substantial nature about the presence of severe mental, emotional, and/or behavior problems, disturbances or dysfunctions, as defined in the most current edition of the Diagnostic Statistical Manual of the American Psychiatric Association, and which may be caused by the recipient's daily functioning. The department will only consider cases where a diagnostic evaluation has been performed by a licensed psychiatrist or a licensed psychologist who has accordingly limited his or her practice to child psychiatry or child psychology. The evaluation must clearly and substantially document how the dentofacial deformity is related to the child's mental, emotional, and/or behavior problems. And that orthodontic treatment is necessary and, in this case, will significantly ameliorate the problems.

"(3) A recipient who becomes [m]edicaid eligible and is already receiving orthodontic treatment must demonstrate that the need for service requirements specified in subsections (e) (1) and (2) of these regulations were met before orthodontic treatment commenced, meaning that prior to the onset of treatment the recipient would have met the need for services requirements."

[2] Section 1396d (r) of title 42 of the United States Code provides in relevant part: "Early and periodic screening, diagnostic, and treatment services

"The term 'early and periodic screening, diagnostic, and treatment services' means the following items and services:

"(1) Screening services—

"(A) which are provided—

"(i) at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organizations involved in child health care . . .

"(ii) at such other intervals, indicated as medically necessary, to determine the existence of certain physical or mental illnesses or conditions; and

"(B) which shall at a minimum include—

"(i) a comprehensive health and developmental history (including assessment of both physical and mental health development),

"(ii) a comprehensive unclothed physical exam,

"(iii) appropriate immunizations (according to the schedule referred to in section 1396s [c] [2] [B] [i] of this title for pediatric vaccines) according to age and health history,

"(iv) laboratory tests (including lead blood level assessment appropriate for age and risk factors), and

"(v) health education (including anticipatory guidance).

"(2) Vision services . . . .

trative appeal pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., from the decision of the defendant, the commissioner of the department of social services (department), and the intervening defendant, Health Net of Connecticut, Inc. (Health Net), denying the plaintiff's request for payment of orthodontic treatment for her minor daughter, Sarah Asadoorian (Sarah), who is an EPSDT recipient. The department and Health Net now appeal from the judgment of the trial court sustaining the administrative appeal and remanding the case to the department for further proceedings.[3] We reverse the judgment of

"(3) Dental services—

"(A) which are provided—

"(i) at intervals which meet reasonable standards of dental practice, as determined by the State after consultation with recognized dental organizations involved in child health care, and

"(ii) at such other intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition; and

"(B) which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health.

"(4) Hearing services . . . .

"(5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

"Nothing in this subchapter shall be construed as limiting providers of early and periodic screening, diagnostic, and treatment services to providers who are qualified to provide all of the items and services described in the previous sentence or as preventing a provider that is qualified under the plan to furnish one or more (but not all) of such items or services from being qualified to provide such items and services as part of early and periodic screening, diagnostic, and treatment services. The Secretary shall, not later than July 1, 1990, and every 12 months thereafter, develop and set annual participation goals for each State for participation of individuals who are covered under the State plan under this subchapter in early and periodic screening, diagnostic, and treatment services."

[3] We refer herein to the department and Health Net individually by name and collectively as the defendants. Both of the defendants appealed separately from the judgment of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Each appeal has its own docket number; we

the trial court and remand the case to that court with direction to render judgment dismissing the plaintiff's administrative appeal.

The record reveals the following undisputed facts and procedural history. The department utilizes a points system known as the Salzmann Assessment as part of its method for determining whether orthodontic treatment is medically necessary for medicaid recipients in the EPSDT program. See Regs., Conn. State Agencies § 17-134d-35 (e) (1); see also footnote 1 of this opinion. The Salzmann Assessment was created by J. A. Salzmann, a professor of orthodontics, and adopted by the American Association of Orthodontists "to provide a method for establishing priority in accepting patients in public health and prepayment programs in keeping with available professional personnel and budgetary requirements . . . ." J. A. Salzmann, "Orthodontics in Public Health and Prepayment Programs," Orthodontics in Daily Practice (1974) p. 629. The Salzmann Assessment "provides a method for assessing the severity of a malocclusion according to [a] numerical rating of the maloccluded, missing, and malpositioned permanent teeth. The deviations and assigned point values (weights) employed [therein] are based on a consensus among orthodontists of their contribution to the severity of occlusal and dentofacial deviations that interfere with dental health, function, and esthetics." Id. The scoring is done on a standard form, and the assessment

---

have consolidated them only for purposes of oral argument before this court and resolution.

We also note that the judgment of the trial court remanding the case to the department for further proceedings is an appealable final judgment under General Statutes § 4-183 (j). See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 675, 855 A.2d 212 (2004) ("where the court issues a remand pursuant to § 4-183 (j), the remand is a final judgment for purposes of appeal, irrespective of both the nature of the remand and the administrative proceedings that are expected to follow it").

may be made using either molds of the patient's teeth or directly from the patient's mouth. Id.

"The total score for an individual provides an index to the need for treatment unaffected by subjective considerations of etiology, treatment planning, difficulty and duration of treatment required, or other professional judgments. However, special circumstances that affect the acceptability of an individual patient can be inserted under [the form category for] 'Remarks.' " Id., p. 630. The score utilized under the assessment "is then set at a [points total] that will include a sufficient number of children for treatment in keeping with available competent professional personnel and funds budgeted for orthodontics. . . . Practical experience in using the Index indicates that a score of about [twenty-six] points or more usually indicates a high-priority malocclusion that requires treatment." Id., pp. 630–31.

The department's regulations deem orthodontic treatment to be medically necessary per se for any eligible recipient who receives a Salzmann Assessment score of twenty-four or more points. Regs., Conn. State Agencies § 17-134d-35 (e) (1). If the recipient scores less than twenty-four points, the analysis proceeds to a second step whereby "the [d]epartment shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures. Other deviations shall be considered to be severe if, left untreated, they would cause irreversible damage to the teeth and underlying structures." Id. The regulation also states that, "[i]f the total score is less than twenty-four . . . points the [d]epartment shall consider additional information of a substantial nature about the presence of severe mental, emotional, and/or behavior problems, disturbances or dysfunctions" that are related to the "dentofacial deformity" if "orthodontic treatment is necessary and . . .

will significantly ameliorate the problems." Id., § 17-134d-35 (e) (2); see also footnote 1 of this opinion.

In the present case, Sarah is a minor who is eligible for and receives medicaid EPSDT medical services, which are known in Connecticut as "Husky A." Health Net is Sarah's managed care provider pursuant to its contract with the department. Russell Ferrigno, an orthodontist, examined Sarah and determined that she had an overbite of seven to eight millimeters, compared to a normal range of one to three millimeters. Ferrigno requested from Doral Dental (Doral), a subcontractor of Health Net, authorization to provide Sarah with orthodontic services. Ferrigno had determined that Sarah's condition placed her at thirty points on the Salzmann Assessment.

Thereafter, Ferrigno sent X rays and molds of Sarah's teeth to Doral. A Doral orthodontist examined them and determined that her condition warranted only eight points on the Salzmann Assessment. Accordingly, Doral denied the plaintiff's request for Sarah's orthodontic services on the ground that such services were not medically necessary.

Subsequently, Ferrigno sent a letter to Doral explaining why he felt that Sarah required orthodontic treatment. Ferrigno stated therein that, although Sarah has a class I malocclusion, which means that her back teeth line up normally, she has other conditions requiring correction. A second orthodontist at Doral then assessed the initial denial of benefits and examined new X rays and molds of Sarah's teeth. He also assigned Sarah's condition eight points on the Salzmann Assessment. At oral argument before this court, the plaintiff conceded that Sarah's teeth were scored correctly as eight points on the Salzmann Assessment.

Thereafter, in October, 2002, an administrative hearing was held before a department hearing officer at the

request of the plaintiff. The hearing officer determined that Health Net and Doral properly had denied the plaintiff's request for orthodontic services. The hearing officer found that Ferrigno improperly had assigned sixteen points to Sarah's overbite, which was not sufficiently extensive to meet the definition of an overbite under the Salzmann Assessment; therefore, it did not warrant the assignment of *any* points on that scale. The hearing officer also found that Ferrigno improperly had assigned points to eight teeth for the overbite, even though the Salzmann Assessment permits only four teeth to be included in the overbite scoring.

The plaintiff appealed from the decision of the department hearing officer to the trial court pursuant to General Statutes § 4-183. The trial court subsequently granted Health Net's motion to intervene as a party defendant. After considering the federal and state statutory and regulatory schemes, as well as applicable case law, including this court's decision in *Persico* v. *Maher*, 191 Conn. 384, 465 A.2d 308 (1983), the trial court stated that, "it is clear that attempts by the [department] to establish eligibility requirements for medicaid which are stricter than those authorized by the medicaid act are ineffective." The trial court concluded that the department's decision was incorrect because, although it "addresses the elements of Connecticut's plan which deal with the criteria for orthodontic services, it ignores the mandate of 42 U.S.C. § 1396d (r) (5) that a state shall provide such other necessary health care . . . to correct or ameliorate defects *whether or not such services are covered under the state plan.*" (Emphasis in original; internal quotation marks omitted.) The trial court also concluded that the department's decision improperly established irreversibility of orthodontic damage as a criterion for treatment eligibility "without authority to do so in federal or Connecticut statute or regulation . . . ." Accordingly, the trial court rendered

judgment sustaining the plaintiff's administrative appeal and remanded the case to the department for a new hearing.[4] These appeals followed.[5]

On appeal, the defendants contend that the trial court improperly added a step to the medical necessity analysis by applying the catch-all provision of the EPSDT statute, 42 U.S.C. § 1396d (r) (5), which they argue is inapplicable because there is a different subdivision that pertains specifically to dental care, namely, § 1396d (r) (3). They also claim that the orthodontics regulation is a reasonable restriction on orthodontic treatment and, therefore, does not violate federal medicaid law, which permits states to impose reasonable utilization controls. Finally, the defendants assert that the trial court improperly concluded that the hearing officer was incorrect to consider "irreversibility" of damage in the medical necessity determination.

---

[4] The trial court also stated that "[i]t appears that the hearing officer consciously ignored the provision of 42 U.S.C. § 1396d (r) (5) . . . and that the hearing officer officiously established irreversibility as a criterion for eligibility." The trial court stated that the hearing on remand should be conducted by a different hearing officer in order to "avoid any issue of bias . . . ."

[5] We note that there is no stay of the judgment in effect because there is no automatic stay in administrative appeals; see Practice Book § 61-11 (b); and, in February, 2004, the trial court denied the department's motion for a stay, which was upheld by the Appellate Court in March, 2004, following a motion for review. Thereafter, another hearing was held before a different hearing officer; see footnote 4 of this opinion; who again denied the plaintiff's request for orthodontic treatment in two decisions, one of which was the product of reconsideration. The plaintiff took administrative appeals from those decisions to the Superior Court, which subsequently were consolidated into one proceeding. These proceedings on remand do not affect this court's subject matter jurisdiction over the present appeal. See footnote 3 of this opinion.

In February, 2005, the trial court denied Health Net's motion to stay all proceedings in the pending administrative appeal and set a scheduling order, with oral argument set for April 18, 2005. On March 28, 2005, Health Net moved this court for a stay of those proceedings, which we granted on April 12, 2005. See Practice Book § 60-2 (4) (court in which appeal is pending may "order a stay of any proceedings ancillary to a case on appeal").

In response, the plaintiff, supported by the amici,[6] claims that the trial court properly considered § 1396d (r) in its entirety, rather than confining its inquiry to subdivision (3). The plaintiff contends that the trial court properly construed § 1396d (r) in a manner that effectuates "the breadth and beneficence of Congress' goal in creating EPSDT." Finally, the plaintiff claims that the orthodontics regulation is improperly restrictive, and therefore, violates federal medicaid law.

We begin our analysis by setting forth the applicable standard of review. "Ordinarily, [o]ur resolution of [such appeals] is guided by the limited scope of judicial review afforded by the [UAPA] . . . to the determinations made by an administrative agency. [W]e must decide, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . .

"A reviewing court, however, is not required to defer to an improper application of the law. . . . It is the function of the courts to expound and apply governing principles of law. . . . We previously have recognized that the construction and interpretation of a statute is a question of law for the courts, where the administrative decision is not entitled to special deference . . . . Questions of law [invoke] a broader standard of review than is ordinarily involved in deciding whether, in light

---

[6] The plaintiff is supported by the amici, which included Center for Children's Advocacy, Inc., Connecticut Oral Health Initiative, Inc., Connecticut Society of Pediatric Dentists, Connecticut Voices for Children, Greater Hartford Legal Aid, Inc., National Health Law Program, New Haven Legal Assistance Association, Quinnipiac University School of Law Health Law Clinic, and Robert Zavoski, president of the Connecticut chapter of the American Academy of Pediatrics.

of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Because this case forces us to examine a question of law, namely, [statutory] construction and interpretation . . . our review is de novo." (Citations omitted; internal quotation marks omitted.) *Director, Retirement & Benefits Services Division* v. *Freedom of Information Commission*, 256 Conn. 764, 770–72, 775 A.2d 981 (2001).

"It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004); see also General Statutes § 1-2z (plain meaning rule);[7] *Webster Bank* v. *Oakley*, 265 Conn. 539, 554–55, 830 A.2d 139 (2003) (stating that "principles of comity and consistency" require this court to follow plain meaning rule in construing federal statutes), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 244 (2004).

I

THE APPLICABLE FEDERAL AND STATE
STATUTORY AND REGULATORY
SCHEME GOVERNING EPSDT

A review of the state and federal statutes and regulations that form the legal landscape of the medicaid EPSDT program provides the necessary context for our review of the defendants' claims on appeal. "Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states

---

[7] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

that furnish medical assistance to eligible low-income individuals. . . . States electing to participate in the program must comply with certain requirements imposed by the [medicaid] [a]ct and regulations of the Secretary of Health and Human Resources.[8] . . . The Secretary has delegated his federal administrative authority to the Centers for Medicare and Medicaid Services ('CMS'), an agency within the Department of Health and Human Services. . . .

"To qualify for federal assistance, a state must submit to the Secretary and have approved a 'state plan' for 'medical assistance,' 42 U.S.C. § 1396a (a), that contains a comprehensive statement describing the nature and scope of the state's [m]edicaid program. 42 CFR § 430.10 (1989). 'The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical assistance provided to eligible individuals.' . . .

"The [m]edicaid [a]ct defines 'medical assistance' as 'payment of part or all of the cost of . . . care and services' included in an enumerated list of twenty-seven general health care categories ('medical assistance categories'). 42 U.S.C. § 1396d (a). Some of the categories must be included within state plans (mandatory categories) while others may be included at the option of the state (optional categories). 42 U.S.C. § 1396a (a) (10) (A).

"The [a]ct requires that each state plan provide EPSDT health care and services as a mandatory category of medical assistance. The [a]ct describes EPSDT as 'early and periodic screening, diagnostic, and treat-

---

[8] "Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. . . . Pursuant to General Statutes §§ 17b-262 and 17b-10, the department has developed Connecticut's state medicaid plan and has promulgated regulations that govern its administration." (Citations omitted.) *Ahern* v. *Thomas*, 248 Conn. 708, 713–14, 733 A.2d 756 (1999).

ment services (as defined in subsection [r] of this section) for individuals who are eligible under the plan and are under the age of twenty-one.' 42 U.S.C. §§ 1396a (a) [10] (A), 1396d (4) (B). Subsection (r) further defines EPSDT services as, inter alia, '[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d (a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the [s]tate plan.' 42 U.S.C. § 1396d (r) (5).

"Thus, EPSDT is a comprehensive child health program designed to assure the availability and accessibility of health care resources for the treatment, correction and amelioration of the unhealthful conditions of individual [m]edicaid recipients under the age of twenty-one. . . . A principal goal of the program is to '[a]ssure that health problems found are diagnosed and treated early, before they become more complex and their treatment more costly.' " (Citations omitted.) *S.D. ex rel. Dickson* v. *Hood*, 391 F.3d 581, 585–86 (5th Cir. 2004).

States are given "flexibility within the [f]ederal statute and regulations to design an EPSDT program that meets the health needs of recipients within [their] jurisdiction." CMS State Medicaid Manual (2005) § 5010 C, p. 5-3 (State Medicaid Manual), available at http://www.cms.hhs.gov/manuals/pub45/pub_45.asp.[9] States

---

[9] The State Medicaid Manual is the " 'official medium by which [CMS] issues mandatory, advisory, and optional [m]edicaid policies and procedures to the [m]edicaid [s]tate agencies . . . .' " *S.D. ex rel. Dickson* v. *Hood*, supra, 391 F.3d 590, quoting State Medicaid Manual, supra, Foreword. The State Medicaid Manual is "relatively informal," but is "entitled to respectful consideration in light of the agency's significant expertise, the technical complexity of the [m]edicaid program, and the exceptionally broad authority conferred upon the Secretary under the [a]ct." *S.D. ex rel. Dickson* v. *Hood*, supra, 590 n.6; accord *Rabin* v. *Wilson-Coker*, 362 F.3d 190, 197–98 (2d Cir. 2004) (statutory interpretation in manual entitled to " 'significant,' " but not conclusive, deference because it is not subject to notice and comment process).

may use this flexibility to "establish the amount, duration and scope of services provided under the EPSDT benefit," although "[a]ny limitations imposed must be reasonable and services must be sufficient to achieve their purpose . . . ." Id., § 5122, p. 5-10, citing 42 C.F.R. § 440.230. Indeed, states "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230 (d). It is well settled that these limits may not, however, be stricter than any set forth by federal statute or regulation. See, e.g., *Persico* v. *Maher*, supra, 191 Conn. 393.

This flexibility extends to dental services, which states are required to provide under 42 U.S.C. § 1396d (r) (3). See State Medicaid Manual, supra, § 5124 B 2 b, pp. 5-17 through 5-18; see also *Jacobus* v. *Dept. of PATH*, 177 Vt. 496, 499, 857 A.2d 785 (2004). By statute, such dental services, however, "shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health." 42 U.S.C. § 1396d (r) (3) (B). The State Medicaid Manual elaborates further on the states' responsibilities with respect to dental care: "Dental care includes emergency and preventive services and therapeutic services for dental disease which, if left untreated, may become acute dental problems or may cause irreversible damage to the teeth or supporting structures." State Medicaid Manual, supra, § 5124 B 2 b, p. 5-18. After describing emergency and preventive dental services, the State Medicaid Manual states that therapeutic services include, inter alia, "[o]rthodontic treatment when medically necessary to correct handicapping malocclusion." Id., § 5124 B 2 b, p. 5-19.

Section 17-134d-35 of the Regulations of Connecticut State Agencies is the orthodontics regulation that gov-

In recognition of the internet websites' tendency to change over time, print copies of internet sources cited herein have been filed in the appellate clerk's office with the case file.

erns the provision of orthodontic treatment under the state EPSDT program, and provides that the state will pay for orthodontic services pursuant to the EPSDT program if they are "provided by a qualified dentist" and are "deemed medically necessary as described in these regulations." Regs., Conn. State Agencies § 17-134d-35 (a). Subsection (e) of § 17-134d-35, which is at issue in this appeal, provides a detailed procedure by which the department determines whether orthodontic services are medically necessary. See part III of this opinion; see also footnote 1 of this opinion.

We also note the state's general definition of medical necessity, which provides: " 'Medical necessity or medically necessary' means health care provided to correct or diminish the adverse effects of a medical condition or mental illness; assist an individual in attaining or maintaining an optimal level of health; diagnose a condition; or prevent a medical condition from occurring . . . ." Regs., Conn. State Agencies § 17b-262-523 (15). Finally, the department will not pay for "any procedures, goods, or services of an unproven, educational, social, research, experimental, or cosmetic nature; for any diagnostic, therapeutic, or treatment goods or services in excess of those deemed medically necessary and medically appropriate by the department to treat the client's condition; or for services not directly related to the client's diagnosis, symptoms, or medical history . . . ." Regs., Conn. State Agencies § 17b-262-531 (g).

## II

## WHETHER THE TRIAL COURT IMPROPERLY CONCLUDED THAT THE HEARING OFFICER SHOULD HAVE CONSIDERED 42 U.S.C. § 1396d (r) (5) IN ADDITION TO THE TERMS OF THE ORTHODONTICS REGULATION

The trial court concluded that the hearing officer improperly "ignore[d] the mandate" of 42 U.S.C. § 1396d

(r) (5), which requires states to provide "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the [s]tate plan." The trial court determined that the hearing officer, after applying the orthodontics regulation, improperly had failed to take the required "second step" of considering Sarah's eligibility under § 1396d (r) (5). We conclude that § 1396d (r) (5) does not require a hearing officer to conduct a medical necessity analysis separate and apart from that prescribed by the orthodontics regulation because dental services are not governed by that subdivision. Instead, dental services are governed specifically by subdivision (3) of § 1396d (r).

Section 1396d (r) (5) requires the states to provide "other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the [s]tate plan." Subdivision (5) of § 1396d (r) refers to § 1396d (a), which defines the term " 'medical assistance' " as "payment of part or all of the cost of the following care and services," in twenty-seven enumerated categories, including, in relevant part: "dental services"; 42 U.S.C. § 1396d (a) (10); and "early and periodic screening, diagnostic, and treatment services (as defined in subsection [r] of this section) for individuals who are eligible under the plan and are under the age of 21 . . . ." 42 U.S.C. § 1396d (a) (4) (B).

Congress enacted subdivision (5) of § 1396d (r) in 1989 as a general catch-all provision in "response to the disappointing performance of the EPSDT treatment function as optional and within each state's discretion."

*S.D. ex rel. Dickson* v. *Hood,* supra, 391 F.3d 592. "Congress intended that the health care, services, treatment and other measures that must be provided under the EPSDT program be determined by reference to federal law, not state preferences." Id. Congress intended to effectuate the EPSDT screening program by requiring the states "to correct or ameliorate the defects, illnesses and conditions . . . discovered by the screening services." Id.

In contrast to the general terms of subdivision (5) of § 1396d (r), subdivision (3) addresses EPSDT dental services with far greater specificity. See 42 U.S.C. § 1396d (r) (3) (B) (dental services "shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health"). It is well settled that "[w]here statutes contain specific and general references covering the same subject matter, the specific references prevail over the general." *Galvin* v. *Freedom of Information Commission,* 201 Conn. 448, 456, 518 A.2d 64 (1986); see also *Gaynor* v. *Union Trust Co.,* 216 Conn. 458, 476–77, 582 A.2d 190 (1990) ("[if] there are two provisions in a statute, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one case or subject within the scope of a general provision, then the particular provision must prevail; and if both cannot apply, the particular provision will be treated as an exception to the general provision" [internal quotation marks omitted]). Indeed, the trial court's application of subdivision (5) renders superfluous subdivision (3). This, of course, violates cardinal principles of statutory construction because it is understood that "the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Carmel Hollow Associates Ltd. Partnership* v.

*Bethlehem*, 269 Conn. 120, 135, 848 A.2d 451 (2004). Accordingly, subdivision (5) of § 1396d (r) is inapplicable to those medical services that already are addressed expressly in the other subdivisions of the statute, namely, vision, hearing and dental services. See 42 U.S.C. § 1396d (r) (2), (3) and (4).

Moreover, medical necessity remains the touchstone for the provision of services under either subdivision (5) of § 1396d (r) or subdivision (3). There is nothing in the text or legislative history of subdivision (5) that precludes states from using utilization controls to determine whether requested services are medically necessary. See H.R. Rep. No. 101-247, 101st Cong., 1st. Sess. 399 (1989), reprinted in 1989 U.S.S.C.A.N. 1906, 2125 ("[w]hile [s]tates may use prior authorization and other utilization controls to ensure that treatment services are medically necessary, these controls must be consistent with the preventive thrust of the EPSDT benefit"). Accordingly, the reliance by the amici and the plaintiff at oral argument before this court on the recent decision by the Fifth Circuit Court of Appeals in *S.D. ex rel. Dickson* v. *Hood*, supra, 391 F.3d 581, is misplaced. In that case, which provides a paradigmatic example of the application of § 1396d (r) (5), a physician had prescribed disposable incontinence underwear for a medicaid recipient who was a teenage boy with spina bifida suffering from bowel and bladder incontinence. Id., 584–85. The physician had concluded that the incontinence underwear was medically necessary because the boy had a lack of sensation below his waist, and therefore, was prone to infection. Id. The physician also "determined that without such a prescription, [the boy] would be home bound, isolated and unable to attend school or engage in other age-appropriate activities." Id., 585. The state department of social services refused, however, to pay for the underwear, stating that diapers

were " 'specifically excluded from coverage' under the Louisiana State Medicaid Plan." Id.

The Fifth Circuit concluded that the state was obligated by § 1396d (r) (5) to pay for the incontinence underwear because "participating states must provide all services within the scope of § 1396d (a) which are necessary to correct or ameliorate defects, illnesses, and conditions in children discovered by the screening services." Id., 593. The court stated that, because it was undisputed on appeal that the incontinence underwear was medically necessary, the key question was whether the incontinence underwear was a service described by § 1396d (a). Id., 593–94. After reviewing CMS regulations and other states' plans that had been approved by CMS, the court concluded that incontinence underwear was included within the ambit of § 1396d (a) (7), which includes "home health care services" as a category of medical assistance.[10] Id., 595–96.

*S.D. ex rel. Dickson* v. *Hood*, supra, 391 F.3d 581, is distinguishable from the present case because, in that case, it was necessary to resort to the catch-all provision as the incontinence underwear was not a benefit addressed specifically by the other subdivisions of § 1396d (r). The underwear also was clearly medically necessary because of the recipient's condition, and the broad catch-all worked as Congress intended to ensure that the EPSDT recipient therein received the services that he needed.

Accordingly, we also disagree with *Jacobus* v. *Dept. of PATH*, supra, 177 Vt, 496, to the extent that the amici

---

[10] The court did emphasize, however, that this was an optional category of assistance that the state ordinarily need not provide, but that the exclusion could not be applied to younger persons receiving EPSDT services. *S.D. ex rel. Dickson* v. *Hood*, supra, 391 F.3d 597. We also note that the court recognized that CMS had approved state plans that placed limitations on the amount of incontinence supplies that would be paid for by medicaid. Id., 595 n.12.

rely on it for the proposition that § 1396d (r) (5) is applicable to orthodontic treatment. In *Jacobus*, the Vermont Supreme Court cited *both* subdivision (5) and subdivision (3) of § 1396d (r) only to support the unremarkable proposition that, "[u]nder [the] 1989 amendments to the [m]edicaid [a]ct, dental screening and treatment for children under the age of twenty-one is mandatory." Id., 499. In our view, the Vermont court's citation to subdivision (5) in support of that proposition simply was redundant and unnecessary given the specificity of subdivision (3). Moreover, in *Jacobus*, the court specifically declined to reach the issue of whether the department secretary's administrative interpretation of " 'medically necessary' " as " 'to identify and treat serious handicapping malocclusions—those malocclusions that carry with them real functional deficit,' " met the "minimum federal treatment standard" under § 1396d (r) (3).[11] Id.

---

[11] In *Jacobus*, the secretary of the state human services department had reversed the decision of an administrative board granting coverage for interceptive, or preventative, orthodontic treatment for two girls. *Jacobus* v. *Dept. of PATH*, supra, 177 Vt. 496–98. The state regulations governing the provision of orthodontics under the EPSDT program stated that such care would be provided if: (1) the child's condition met listed numerical criteria; or (2) the care was " 'otherwise necessary' " under a regulation that was an exact quotation of § 1396d (r) (5). Id., 500. The secretary interpreted the second prong as being limited to " 'handicapping malocclusions . . . that carry with them real functional deficit.' " Id., 499. The Vermont Supreme Court concluded that this interpretation was invalid under federal law because it deprived recipients of an opportunity for individualized review of their cases. Id., 501. Moreover, the secretary's interpretation treated persons who required preventative or interceptive orthodontics differently than those who required treatment of existing malocclusions; the court reasoned that, under the secretary's " 'handicapping malocclusions' " standard, no recipient ever could qualify for preventative orthodontics. Id., 500. Accordingly, the court concluded that the interpretation violated federal statutes and regulations requiring comparable standards for all groups and prohibiting discrimination on the basis of diagnosis. Id., 499–501 (discussing 42 U.S.C. § 1396a [a] [17], and 42 C.F.R. § 440.230 [c]). Indeed, the court noted that the secretary had only applied the numerical criteria to the girls' cases, and had not conducted a review of their individual circumstances. Id., 501–502.

Accordingly, we conclude that the trial court improperly construed § 1396d (r) (5) to create a required second step to the medical necessity test utilized by the department pursuant to the orthodontics regulation. That subdivision is inapplicable to the present case given the pertinence of subdivision (3), which speaks specifically to dental care. Accordingly, we now turn to the next issue in this appeal, which is whether the regulation meets the minimum standards required under federal law.

### III

### WHETHER THE ORTHODONTICS REGULATION IS VALID AS A REASONABLE UTILIZATION CONTROL

The defendants next contend that the trial court improperly concluded that the orthodontics regulation is invalid as an eligibility requirement that is more restrictive than the federal medicaid statutes and regulations permit. In response, the plaintiff contends that the orthodontics regulation violates this court's decision in *Persico* v. *Maher*, supra, 191 Conn. 394, wherein we held that a blanket exclusion of orthodontic care violated federal medicaid statutes and regulations. The plaintiff attacks the substance of the regulation, and asserts that: (1) the Salzmann Assessment is antiquated and never was intended for determinations of medical necessity; and (2) the "savings clauses" in the second and third prongs of the regulation are useless because they are circular and impossible for recipients to satisfy. We agree with the defendants.

The United States Supreme Court has stated that, "[a]lthough serious statutory questions might be presented if a state [m]edicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the [medicaid] [a]ct for a [s]tate to refuse to fund unnecessary—though perhaps

desirable—medical services." *Beal* v. *Doe,* 432 U.S. 438, 444–45, 97 S. Ct. 2366, 53 L. Ed. 2d 464 (1977) (upholding state's refusal to extend medicaid coverage to nontherapeutic abortions); see also *Pharmaceutical Research & Manufacturers of America* v. *Walsh,* 538 U.S. 644, 665, 123 S. Ct. 1855, 155 L. Ed. 2d 889 (2003) ("the [m]edicaid [a]ct gives the [s]tates substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the best interests of the recipients" [internal quotation marks omitted]). " '[T]hus, where the state sets stricter standards for eligibility than those enumerated by the pertinent federal law, the state standards are tacitly inconsistent with those federal provisions.' " *Persico* v. *Maher,* supra, 191 Conn. 393, quoting *Morgan* v. *White,* 168 Conn. 336, 344, 362 A.2d 505 (1975).

We begin with this court's decision in *Persico* v. *Maher,* supra, 191 Conn. 385, wherein the department had denied medicaid coverage for the orthodontic treatment of a thirteen year old boy who was the recipient of EPSDT benefits. There was undisputed evidence that the boy needed orthodontic treatment because his teeth were severely misaligned, with one front tooth being on top of the other, and they were becoming loose and his mouth was bleeding. Id., 387. The boy was withdrawn and self-conscious; he would cover his mouth whenever he talked or smiled. Id. After a fair hearing, the department denied his request for medicaid coverage for orthodontic treatment solely because of a department policy excluding orthodontic coverage except for "[s]pecial consideration [which] may be granted, upon request, for these procedures of an unusual nature not included in the program, necessary to alleviate a serious health problem." (Internal quotation marks omitted.) Id., 391.

On subsequent appeal, this court concluded that the department policy's "denial of orthodontic treatments

to EPSDT beneficiaries, such as the plaintiff's son, violates the federal statutes and regulations and is, therefore, illegal and void." Id., 394. The court emphasized that the state's authority to impose utilization controls was not a license to provide less treatment than was envisioned by the federal statutes and regulations, which "requir[ed] that a state agency provide dental care needed for relief of pain and infections, restoration of teeth and maintenance of dental health." Id., 395.

Consistent with the foregoing principles, we conclude that the orthodontics regulation at issue in the present case is valid as a reasonable utilization control that does not cause recipients to receive less care than was envisioned by § 1396d (r) (3). It is not a blanket exclusion like the policy that this court contemplated in *Persico*. Indeed a CMS publication, "Guide to Children's Dental Care in Medicaid" (2004), appendix A, p. 15 (Dental Guide), available at http://www.cms.hhs.gov/medicaid/epsdt/dentalguide.pdf, which was supplied to this court by the amici, explicitly references in its guidelines for pediatric dental care[12] indices such as the Salzmann Assessment as "common approaches for assessing the severity of malocclusions in the transitional or adolescent dentition." The Dental Guide recognizes that state medicaid programs often use such indices as screening devices, and suggests supplementing their "general utility" with "dentists trained and experienced in pediatric orthodontic and dental-facial orthopedic care to develop and implement orthodontic treatment criteria that can be applied reliably and consistently."[13] Id. Moreover, a model dental bene-

---

[12] This policy statement elaborates on the treatment section of the Dental Guide, which states that orthodontic treatment is required "when medically necessary to correct handicapping and other malocclusions." Dental Guide, supra, p. 12.

[13] The amici point out that the Dental Guide lists several assessment indices by name, specifically the Grainger Orthodontic Treatment Priority Index, HLD and South Carolina Orthodontic Screening Index, but does not include the Salzmann Assessment on its list. Dental Guide, supra, appendix

fits statement, promulgated by the American Academy of Pediatric Dentistry and appended to the Dental Guide, states that medicaid dental "[s]ervices and benefits should include but are not limited to . . . [o]rthodontic services which shall include services for enrollees diagnosed with *severe malocclusion,* and for enrollees following repair of cleft palate; and for enrollees with other congenital or developmental defects or injury resulting in mal-alignment or *severe malocclusion* of teeth . . . ."[14] (Emphasis added.) Id., appendix B, pp. 1–3.

Moreover, our conclusion is consistent with the only other decision addressing the Salzmann Assessment located either by the parties or this court's independent research. In *Chappell* v. *Bradley,* 834 F. Sup. 1030, 1032–33 (N.D. Ill. 1993), the minor plaintiffs brought a class action challenging the procedure by which the state evaluated EPSDT requests for orthodontic care. In *Chappell,* the state contracted with a dental managed care organization for prior approval of medicaid dental care, including orthodontia. Id., 1031–32. The contract stated that the managed care provider could grant prior approval of orthodontic treatment only to recipients with Salzmann scores of forty-two or above, although

A, p. 15. The Dental Guide, however, does not state that this is an exclusive list of acceptable screening assessment tools. Id. (noting that "[t]hese indices and others are often used by state [m]edicaid programs to 'screen' for eligibility for orthodontic treatment").

[14] The amici emphasize the significant collateral consequences of the " 'neglected epidemic' " of untreated oral health problems for the mental and physical health of children. They also cite the impact of the " 'neglected epidemic' " on society in the form of increased costly emergency room visits and increased expenses in treating severe conditions that otherwise could be intercepted and treated more inexpensively at an earlier stage. We are not unmindful of the importance of adequate oral health care to all members of our society, and the obstacles, particularly financial concerns, that may prevent certain members of our society from receiving the most extensive dental care extant. We also recognize, however, that this is a complicated problem, the resolution of which lies beyond the province of this court.

the managed care director had, on some occasions, granted prior approval requests to recipients with Salzmann scores less than forty-two. Id., 1032. In *Chappell*, the state department of public aid upheld the denial of orthodontic care to the two minor plaintiff class representatives, who had received Salzmann scores of thirty-nine and thirty-three. Id., 1032–33.

The federal District Court, resolving cross motions for summary judgment, framed the issue, noting that the parties did not dispute that "under the [m]edicaid law, the state must provide orthodontic services when medically necessary," and that "the state may decline to provide orthodontic treatment for purely cosmetic reasons, and that a state may impose a prior approval requirement." Id., 1034. The court noted that the state had, for fiscal reasons over a span of seven years, raised the Salzmann score required for treatment from thirty to forty-two. Id. The court then denied the parties' motions for summary judgment, identifying an issue of fact as to how the state and the managed care provider used the Salzmann Assessment. Id., 1035–36. The court concluded that the state and the managed care provider were in compliance with the statutes and regulations if the managed care provider "approve[d] a request for orthodontic treatment in all cases where the child score[d] a [forty-two] or more on the Salzmann Index regardless of whether the malocclusion [was] thought to be handicapping, i.e., medically necessary, and . . . approve[d] a request for treatment in other cases where in the professional opinion of the consultant the malocclusion [was] handicapping and medical treatment [was] necessary regardless of the Salzmann score." Id., 1034. The court then stated that use of the Salzmann score as a bright line test for denying treatment, as had allegedly been the case with some plaintiffs, would violate the federal medicaid laws. Id., 1035. Accordingly, the court concluded that further factual inquiry was

necessary, and denied the parties' motions for summary judgment. Id., 1035–36. The court then issued a subsequent order clarifying the decision and stated: "To comply with federal law the [state] must authorize orthodontic treatment to all eligible patients having handicapping malocclusions severe enough to have a medical need for such orthodontic treatment. The [state] need not provide orthodontic care to eligible patients having handicapping malocclusions if such conditions are not severe enough to have a medical need for such orthodontic treatment." *Chappell* v. *Wright*, United States District Court, Docket No. 91C4572 (N.D. Ill. November 24, 1993).

We conclude that the Connecticut orthodontics regulation is a reasonable utilization control that is consistent with the federal statutes and regulations. We note first that the orthodontics regulation ensures that recipients' individual circumstances are addressed in a competent manner because the assessment must be made by a designated "qualified dentist . . . ."[15] Regs., Conn. State Agencies § 17-134d-35 (e). Additionally, the screen-*in* score of twenty-four is significantly lower than the forty-two upheld by the District Court in *Chappell*, and is indeed lower than the twenty-six that Salzmann himself stated "[p]ractical experience . . . indicates [to be] a high-priority malocclusion that requires treatment."[16] J. A. Salzmann, supra, pp. 630–31.

---

[15] A " '[q]ualified dentist' " is defined as a "dentist who:

"(A) Holds himself out to be an orthodontist in accordance with section 20-106a of the Connecticut State Statutes, or

"(B) Documents completion of an American Dental Association accredited post graduate continuing education course consisting of a minimum of two (2) years of orthodontic seminars, and/or submitting three (3) completed case histories with a comparable degree of difficulty as those cases meeting the department's requirements in section (e) of the department's orthodontic policy if requested by the orthodontic consultant." Regs., Conn. State Agencies § 17-134d-35 (b) (1).

[16] The plaintiff argues that the Salzmann Assessment was not intended to determine the medical necessity of orthodontic treatment in individual cases, but instead is a resource allocation method that focuses on how many

Moreover, a score of less than twenty-four will not necessarily result in the denial of orthodontic services because the orthodontics regulation provides two opportunities for additional consideration of individual cases.[17]

If the patient scores less than twenty-four points, the analysis proceeds to a second step whereby "the [d]epartment shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures. Other deviations shall be considered to be severe if, left untreated, they would cause irreversible damage to the teeth and underlying structures."[18] Regs., Conn.

children a community can afford to treat, rather than the children's actual need for treatment. We do not find the concepts of medical necessity and resource allocation as easily divorced from one another as the plaintiff suggests. See J. A. Salzmann, supra, p. 631 (score of twenty-six "indicates a high priority malocclusion that requires treatment"). Moreover, inasmuch as the orthodontics regulation is not inconsistent with federal medicaid law, arguments impugning the efficacy of the Salzmann Assessment as a partial method for determining medical necessity are best directed not to this court, but to the policymakers at the department with the relevant expertise.

[17] The plaintiff attempts to demonstrate that the application of the second and third prongs of the regulation always is a circular inquiry whereby a child with a score of less than twenty-four points never will be able to prove necessity. Accordingly, the plaintiff also contends that the regulation sets a bar even higher than that which this court held invalid in *Persico* v. *Maher*, supra, 191 Conn. 384. We disagree with the plaintiff's reading of the regulation's text, and we note that the record is devoid of any statistical or empirical evidence supporting the plaintiff's contention that resort to the savings clauses is a fool's errand. Cf. *Chappell* v. *Bradley*, supra, 834 F. Sup. 1032 (noting state welfare department statistics demonstrating that "exceptions were granted for approximately 1.7 percent of the individuals who scored less than [forty-two]" on Salzmann Assessment). Moreover, we fail to see how the amorphous test of necessity espoused by the plaintiff would be any more effective than the objective standard presently utilized under the orthodontics regulation.

[18] Accordingly, the trial court improperly concluded that the hearing officer was incorrect to consider irreversibility as a criterion for eligibility, and to deny treatment based in part on the treating orthodontist's failure to state that any damage would be irreversible. Irreversibility of damage is a criterion established by the plain language of the orthodontics regulation; Regs., Conn. State Agencies § 17-134d-35 (e) (1); and is indeed contemplated by

State Agencies § 17-134d-35 (e) (1). As the plaintiff points out, the use of the term "other severe deviations" conceivably could be read as limiting the additional information considered in an individual case to deviations *not* already accounted for in the Salzmann Assessment score under the first prong. See American Heritage College Dictionary (4th Ed. 2002) (defining "other" as: [1] "[b]eing the remaining one of two or more"; [2] "[d]ifferent from that or those implied or specified"; [3] "[o]f a different character or quality"; and [4] "[a]dditional; extra"). Presuming that the dentist performing the Salzmann Assessment would include in the total score every eligible defect, this process would significantly reduce the efficacy of the second prong as a safety net for the consideration of individual circumstances of recipients who have a genuine medical need for orthodontic treatment that is not reflected in their Salzmann score. This result is potentially problematic because the meaningful consideration of recipients' individual circumstances is a key factor in the validity of the regulation under the federal EPSDT statutes and regulations. See *Jacobus* v. *Dept. of PATH*, supra, 177 Vt. 500–502 (administrative interpretation of regulation invalid when it was too narrow in scope to permit for review of individual circumstances); see also *Chappell* v. *Bradley*, supra, 834 F. Sup. 1034 (state complied with EPSDT statutes by reviewing individual circumstances in addition to using Salzmann Assessment). Thus, to keep the second prong of the regulation from falling into fatal conflict with the federal EPSDT statutes and regulations, we read the second prong of the regulation as requiring the department to consider "additional information of [a] substantial nature about the presence

the CMS State Medicaid Manual. State Medicaid Manual, supra, § 5124 B 2 b, p. 5-18 ("[d]ental care includes emergency and preventive services and therapeutic services for dental disease which, if left untreated, may become acute dental problems or may cause *irreversible damage* to the teeth or supporting structures" [emphasis added]).

of [*any*] severe deviations affecting the mouth and underlying structures," regardless of whether they were included in the Salzmann Assessment under the first prong.[19] (Emphasis added; internal quotation marks omitted.) Cf. *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991) ("[W]hen called upon to interpret a statute, we will search for 'an effective and constitutional construction that reasonably accords with the legislature's underlying intent.' . . . These principles . . . commend to us a search for a judicial gloss . . . that will effect the legislature's will in a manner consistent with constitutional safeguards." [Citations omitted.]).

Moreover, § 17-134d-35 (e) (2) of the Regulations of Connecticut State Agencies provides, as an alternative to satisfaction of the second prong, that, "[i]f the total score is less than twenty-four . . . points the [d]epartment shall consider additional information of a substantial nature about the presence of severe mental, emotional, and/or behavior problems, disturbances or dysfunctions" that are related to the "dentofacial deformity"[20] if "orthodontic treatment is necessary and . . . will significantly ameliorate the problems." Accordingly, the regulation permits orthodontic treatment that

---

[19] We note that the hearing officer considered Ferrigno's opinion about Sarah's other oral deviations, and acknowledged his opinion that, " 'it is quite likely [that] there will be future damage to the bone and mouth structures.' " The hearing officer also noted, however, the lack of evidence that any such damage would be irreversible as required by the regulation. See also footnote 18 of this opinion.

[20] The plaintiff attacks the mental health savings clause as circular, arguing that any patient with a "dentofacial deformity" already would be eligible for orthodontic treatment under the first prong. We disagree because the plaintiff's argument fails even under the definition from the American Association of Orthodontists Glossary that she provided in her brief, which defines "[d]entofacial deformity" as "dentofacial malformation characterized by disharmonies of size, form and function, malocclusion, cleft lip and palate and other skeletal or soft-tissue deformities, including various types of muscular dysfunction." This definition contemplates the existence of a wide variety of imperfections and deformities, but says nothing about: (1) their severity; or (2) whether they require treatment.

ordinarily might be cosmetic, and not medically neces-
sary for the malocclusion or deformity by itself, if the
dental problem is causing the recipient significant men-
tal health problems.[21]

Furthermore, we disagree with the plaintiff's con-
tention that the regulation is invalid under the EPSDT
statutes and regulations because it is an evaluation of
" 'appropriateness,' " rather than " 'necessity.' " In *Jack-
son* v. *Millstone*, 369 Md. 575, 582–84, 801 A.2d 1034
(2002), which was relied on by the plaintiff, the plaintiffs
in that case were EPSDT recipients who had needed
liver transplants. Although the state initially had author-
ized medicaid benefits to pay for the liver transplants
in each case, it declined subsequent preauthorization
to pay for transplants after the transplant had failed in
one case and the preauthorization had expired in the
other case, determining that the subsequent transplants
were neither " 'necessary' " nor " 'appropriate' " given
the probability of postoperative complications, despite
the fact that the children certainly would die without
the transplants. Id.

The Maryland Court of Appeals concluded that state
regulations expressly imposing an " 'appropriateness' "
analysis in addition to the " 'necessity' " requirement[22]
were invalid because the federal EPSDT program
"makes no mention of utilizing an 'appropriateness'
analysis in determining whether a medicaid-eligible
child should receive medically necessary treatments
provided through EPSDT services. Nevertheless, the

---

[21] We note that the hearing officer discussed the third prong, but concluded
that the plaintiff had not presented any evidence that Sarah suffered from
any psychological problems.

[22] Under the regulations at issue, " '[n]ecessary' [was] defined as 'directly
related to diagnostic, preventative, curative, palliative, or rehabilitative treat-
ment.' " *Jackson* v. *Millstone*, supra, 369 Md. 598. " 'Appropriate' [was]
defined as 'an effective service that can be provided, taking into consider-
ation the particular circumstances of the recipient and the relative cost of
any alternative services which could be used for the same purpose.' " Id.

Maryland medicaid provision regarding preauthorization of services . . . requires that medically necessary treatment for a medicaid-eligible child must also be 'appropriate,' which is beyond the dictates of federal law. The federal guidelines allow states no discretion to use an 'appropriateness' test in deciding whether a person under [twenty-one] can receive medically necessary treatment. Therefore, because the provision imposes additional criteria upon qualified recipients, which illegally denies services to those who would normally receive medically necessary treatment, we agree with the plaintiffs that [the regulation] is partially invalid under federal law." Id., 600.

The situation confronted by Maryland's highest court in *Jackson* simply is not this case. In that case, a liver transplant was "necessary" because it was the only way to save the recipients' lives, but it was not "appropriate" in the context of resource allocation for a variety of reasons, including cost and probability of success. In contrast, orthodontics present far more nuanced questions of medical necessity than do organ transplants, which virtually always are lifesaving procedures of last resort. We view the regulation as a reasonable attempt to balance objectively orthodontics as an option that may be *desirable* primarily for aesthetic reasons on the one hand, and orthodontics as a *medically necessary* method of treating significant malocclusions. See *Beal* v. *Doe,* supra, 432 U.S. 444–45. Accordingly, in the absence of more substantial empirical or statistical evidence demonstrating that the regulation is frustrating the goals of the EPSDT program; see footnote 17 of this opinion; we conclude that it is a reasonable utilization control measure, and we reverse the judgment of the trial court to the contrary.[23]

---

[23] Accordingly, we need not reach the department's contention that the trial court improperly concluded that the hearing officer had prejudged the plaintiff's case.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the plaintiff's administrative appeal.

In this opinion the other justices concurred.