IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 25, 2011 Session

# STEVEN FULLER, BY HIS NEXT FRIEND, THERESA-VAY SMITH v. MARK EMKES,[1] COMMISSIONER, TENNESSEE DEPARTMENT OF FINANCE AND ADMINISTRATION

Appeal from the Chancery Court for Davidson County
No. 08-2393-IV     Russell T. Perkins, Chancellor

No. M2010-01590-COA-R3-CV - Filed June 28, 2011

Petitioner, a teenager enrolled in the TennCare program, was denied coverage for orthodontic braces by the Tennessee Department of Finance and Administration ("TDFA"). Petitioner contends he qualifies for orthodontic treatment under Tenn. Comp. R. & Reg. 1200-13-13-.04(1)(b)6 due to a severe misalignment that constitutes a medical necessity. He also contends that Tenn. Comp. R. & Regs. 1200-13-13.04(1)(b)6, which limits orthodontic treatment to persons with "a handicapping malocclusion or another developmental anomaly or injury resulting in severe misalignment or handicapping malocclusion of teeth," is in conflict with the Early and Periodic Screening, Diagnosis and Treatment program in 42 U.S.C. § 1396d(a)(4)(B) and in violation of the Medicaid Act, 42 U.S.C. § 1396d(r)(5). TDFA contends that TennCare regulations provide orthodontic coverage consistent with federal law, that it correctly interpreted and applied its own regulations regarding Petitioner's request for orthodontic braces, and that the courts are to defer to the agency's interpretation of its own rules. The Chancery Court for Davidson County affirmed the administrative decision. We also affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Theresa-Vay Smith and Lenny L. Croce, Oak Ridge, Tennessee, for the appellant, Steven Fuller.

---

[1]Commissioner Emkes has been substituted as a party in the place of Commissioner David Goetz in accordance with Tenn. R. App. P. 19(c).

Robert E. Cooper, Jr., Attorney General and Reporter; Carolyn E. Reed, Assistant Attorney General; and Shayna Abrams, Senior Counsel, for the appellee, Mark Emkes, Commissioner, Tennessee Department of Finance and Administration.

## OPINION

On December 19, 2007, Steven Fuller, a seventeen-year-old TennCare enrollee, and his dentist, Dr. Don Flanagan, requested prior approval for orthodontic braces from Doral Dental, the provider for dental services under the TennCare program. Dr. Thomas Gengler, D.D.S., a dental benefits reviewer for Doral Dental, reviewed Steven's records consisting of x-rays and orthograms, and completed a "Malocclusion Severity Assessment," and assigned Steven a Salzmann Index Score of 17.[2] Dr. Gengler noted no missing teeth, three rotated Maxilla Anterior teeth, one crowded Maxilla Posterior tooth, four crowded Mandible Anterior teeth, and four crowded Mandible Posterior teeth. Another dentist who reviews dental benefits requests for Doral Dental, Dr. Richard Nellen, also reviewed Steven's chart and performed an assessment, and gave Steven a 17 on the Salzmann Index. Dr. Nellen's assessment differed slightly from Dr. Gengler's; he noted a missing Maxilla Anterior tooth and only two rotated Maxilla Anterior teeth.

On December 31, 2007, the Doral Dental Benefits Manager sent a letter denying coverage for braces because the braces "were not medically necessary." The letter referred to the assessment performed by Dr. Nellen in which Steven received a score of 17 on the Salzmann Index, and stated a score of 28 was required in order to qualify. The letter also noted that other conditions that might warrant the need for braces, such as "not being able to talk or eat right" and "your bottom teeth cut the roof of your mouth," were not present. On January 1, 2008, a letter was sent to Dr. Flanagan denying authorization based on Steven's score of 17 on the Salzmann Index. On January 17, 2008, an appeal was filed on behalf of Steven.

A third dentist who consults for Doral Dental, Dr. Karen Arena, reviewed Steven's records consisting of study models, x-rays, and the treatment plan on January 23, 2008, and performed a Malocclusion Severity Assessment. Dr. Arena also scored Steven at 17 on the Salzmann Index. On January 24, 2008, Doral Dental sent a letter that referenced the review performed by Dr. Arena and stated that Steven's study models showed that his bottom and

---

[2]The Salzmann Assessment is a "method for assessing the severity of a malocclusion according to [a] numerical rating of the maloccluded, missing, and malpositioned permanent teeth," and was created by J.A. Salzmann, a professor of orthodontics. *Semerzakis v. Comm'r of Soc. Services*, 873 A.2d 911 (Conn. 2005) (quoting J.A. Salzmann, "Orthodontics in Public Health and Prepayment Programs," Orthodontics in Daily Practice (1974) p. 629).

top teeth were out of line with some crowding and rotation, but that this was not severe enough to cause a handicapping malocclusion, and, thus braces were not medically necessary.

On January 31, 2008, Dr. Roy Berkon, D.D.S., who is the dental consultant for TennCare, conducted a medical necessity review of Steven's case. Dr. Berkon reviewed Steven's OrthoCAD photos and x-rays. Dr. Berkon determined that Steven has a Class I malocclusion with a normal overbite and a normal overjet. He found excessive crowding in the lower anteriors and maxillary anteriors. Dr. Berkon gave Steven a 19 on the Salzmann Index, thereby finding him below the "threshold level" of 28, and also found no evidence of "a medical problem, speech disorder, abnormal chewing, nutritional or oral health problems that would indicate a handicapping malocclusion." Based on his review, Dr. Berkon concluded that braces were not medically necessary. Steven's request for orthodontic braces was then referred to the Legal Solutions Unit of TennCare. Following that unit's review, Steven was advised by letter dated February 5, 2008, that the request for braces was denied because it was not medically necessary.

In April 2008, Dr. William Shipley examined Steven and conducted a Malocclusion Severity Assessment noting one missing Maxilla tooth, one missing Mandible Posterior tooth, three rotated Maxilla Anterior teeth, eight rotated Maxilla Posterior teeth, four crowded Mandible Anterior teeth, and seven crowded Mandible Posterior teeth. Dr. Shipley also found that Steven had three openbites. Dr. Shipley scored Steven a 38 on the Salzmann Index. Dr. Shipley prepared a letter dated May 13, 2008, for Steven's attorney with his findings, which stated that comprehensive orthodontic treatment and the replacement of Steven's right central incisor were the only choice of treatment for his condition.

On August 11, 2008, Dr. Berkon prepared an addendum to his previous review based upon Dr. Shipley's findings and additionally completed a Malocclusion Severity Assessment form.[3] Dr. Berkon noted a missing Maxilla Anterior tooth, a missing Mandible Posterior tooth, one rotated Maxilla Anterior tooth, one rotated Maxilla Posterior tooth, four crowded Mandible Anterior teeth, and four crowded Mandible Posterior teeth, and one openbite.

On August 13, 2008, a contested case hearing was held before an administrative law judge. Steven Fuller, Dr. Shipley, and Dr. Berkon all testified. Steven testified that one of his teeth was missing and that he was infrequently seen by a dentist. Steven also testified that he suffered from asthma. Dr. Berkon testified that he believed Steven's Salzmann Index score was somewhere between a 19 and 21, which was below the score of 28 needed for *per se* orthodontic treatment. Dr. Berkon also stated that Steven presented none of the other

---

[3]Though Dr. Berkon had previously determined that Steven's score on the Salzmann Index was a 19, he had been unable to provide the form of his Malocclusion Severity Assessment to support this finding.

indicators of a handicapping malocclusion. Dr. Berkon admitted that the x-rays he received in the initial review were poor quality and that it was difficult for him to determine if a tooth was missing; however, his opinion that braces were not medically necessary did not change after discovering an additional tooth missing and reviewing the records submitted by Dr. Shipley. Dr. Shipley also testified and his testimony demonstrated a vastly different opinion from Dr. Berkon's regarding Steven's condition. Dr. Shipley believed Steven scored a 38 on the Salzmann Index, and that his condition required braces as a medical necessity.

An Initial Order was filed by the administrative law judge on August 21, 2008, in which he found that TennCare was required to provide Steven with coverage for braces. The order stated that Steven's Salzmann Index Score was a 38 based upon the testimony of Dr. Shipley, which the judge found more persuasive than Dr. Berkon's testimony regarding his review of Steven's file. For this reasons the administrative law judge found that Steven fell within the definition of severe misalignment, which entitled him to braces under Tenn. Comp. R. & Reg. 1200-13-13-.04(1)(b)6 and that Steven had met his burden of proof in demonstrating that braces were a medical necessity.

On September 4, 2008, the TDFA Commissioner's Designee, Dr. James Gillcrist, D.D.S., reversed the Initial Order of the administrative law judge. Dr. Gillcrist found that the record did not support a finding that Steven had a handicapping malocclusion. The Final Administrative Order stated that Steven's condition was not a handicapping malocclusion for the following reasons:

a. There is no evidence of a medical condition and/or a nutritional deficiency with medical physiological impact that is documented in a physician's progress notes that pre-date the diagnosis and request for orthodontics. There are no indications that [Steven's] condition is non-responsive to medical treatment without orthodontic treatment.

b. There is no evidence of the presence of speech pathology that is documented in speech therapy progress notes that pre-date the diagnosis and request for orthodontics. There is no evidence that [Steven] is non-responsive to speech therapy without orthodontic treatment.

c. There is no evidence of palatal tissue laceration from a deep impinging overbite where lower incisor teeth contact palatal mucosa. (This condition does not include occasional biting of the cheek.) There is no evidence that confirms the presence of this condition.

Thus, the Order stated that the braces were not medically necessary to treat a handicapping malocclusion.

On October 31, 2008, Steven ("Petitioner") filed a Complaint and Petition for Judicial Review of the decision denying coverage in the Davidson County Chancery Court, claiming the Final Administrative Order was in violation of constitutional or statutory provisions, in excess of statutory authority, made upon unlawful procedure, arbitrary or capricious, and unsupported by the evidence. An amended complaint was filed on December 19, 2010. On June 16, 2010, the chancery court issued a Memorandum Opinion affirming the order and finding "no prejudicial error in TennCare's decision." The court stated that while there was substantial and material evidence to support the administrative law judge's finding and that it was difficult to ascertain what deference was given to the administrative law judge's findings of fact, there was also substantial and material evidence to support the decision that braces were not medically necessary, and, thus under the standard of review, there was no prejudicial error. Petitioner filed a timely appeal.

## ANALYSIS

On appeal, Petitioner argues that the chancellor erred in failing to reverse the Final Administrative Order. Petitioner contends that the orthodontic treatment is a covered service under current federal and state statutes and regulations. Petitioner further argues that orthodontic braces are medically necessary to treat his condition under state and federal law.

## I.
### STANDARD OF REVIEW

Judicial review of decisions of administrative agencies, when those agencies are acting within their area of specialized knowledge, experience, and expertise, is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h) rather than the broad standard of review used in other civil appeals. *Willamette Indus., Inc. v. Tennessee Assessment Appeals Comm'n,* 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999) (citing *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279-80 (Tenn. Ct. App. 1988)).

The trial court may reverse or modify the decision of the agency if the petitioner's rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1)     In violation of constitutional or statutory provisions;
(2)     In excess of the statutory authority of the agency;

> (3)  Made upon unlawful procedure;
>
> (4)  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h)(1)-(5)(A).  However, the trial court may not substitute its judgment concerning the weight of the evidence as to questions of fact. Tenn. Code Ann. § 4-5-322(h)(5)(B); *see also Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002).  The same limitations apply to the appellate court. *See Humana of Tennessee v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664, 668 (Tenn. 1977) (holding the trial court, and this court, must review these matters pursuant to the narrower statutory criteria). Thus, when reviewing a trial court's review of an administrative agency's decision, this court is to determine "whether or not the trial court properly applied the . . . standard of review" found at Tenn. Code Ann. § 4-5-322(h). *Jones*, 94 S.W.3d at 501 (quoting *Papachristou v. Univ. of Tennessee,* 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)).

## II.
### APPLICABLE FEDERAL AND STATE STATUTES AND REGULATIONS

A brief overview of the applicable federal and state statutory and regulatory provisions is pertinent to our analysis of this issue. The federal program commonly known as "Medicaid" was established by an amendment to the Social Security Act known as the "Medicaid Act" contained in Title XIX. *See* 42 U.S.C. § 1396 *et seq*. "Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." *Semerzakis v. Comm'r of Soc. Serv.*, 873 A.2d 911, 918 (Conn. 2005) (quoting *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585-86 (5th Cir. 2004)). States receiving funds from the federal government under the program must comply with federal statutes and regulations. *Id*; *see also Markva v. Haveman*, 317 F.3d 547, 550 (6th Cir. 2003).  The Tennessee Department of Finance and Administration is the Tennessee state agency that administers the Medicaid program in Tennessee, known as TennCare. Tenn. Code Ann. § 71-5-104; Tenn. Exec. Order No. 23 (Oct. 19, 1999).

Pursuant to the Medicaid Act, enrollees under 21 years of age are entitled to coverage for medical and dental services under the federal Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") program. 42 U.S.C. § 1396d(a)(4)(B); Tenn. Comp. R. & Regs.

1200-13-13-.04(6).[4] The EPSDT program is a comprehensive child health program which is designed to "assure the availability and accessibility of health care resources for the treatment, correction and amelioration of the unhealthful conditions of individual medicaid recipients under the age of twenty-one." *Semerzakis*, 873 A.2d at 918 (quoting *S.D. ex rel. Dickson*, 391 F.3d at 585-86). "A principal goal of the program is to 'assure that health problems found are diagnosed and treated early, before they become more complex and their treatment more costly.'" *Id*. (quoting *S.D. ex rel. Dickson*, 391 F.3d at 585-86). The stated purpose of this program is to provide enrollees under 21 years of age "[s]creening and diagnostic services to determine physical or mental defects in recipients" and "[h]ealth care, treatment, and other measures to correct or ameliorate any defects and chronic conditions discovered." 42 C.F.R. § 440.40(b).

Pursuant to the EPSDT program, at a minimum, dental services should be provided for "the relief of pain and infections, restoration of teeth, and maintenance of dental health." 42 U.S.C. § 1396d(r)(3)(B). Dental care is defined by federal regulations as "diagnostic, preventive, or corrective procedures . . . including treatment of . . . [t]he teeth and associated structures of the oral cavity" and the treatment of any "[d]isease or impairment that may affect the oral or general health of the recipient." 42 C.F.R. § 440.100(a)(1)-(2). Nevertheless, states are permitted to "place appropriate limits on a service based upon such criteria as medically necessity or on utilization control procedures." 42 C.F.R. § 440.230(d).

To provide guidance to states on the program and its coverage, the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services, published the State Medicaid Manual.[5] The State Medicaid Manual states the EPSDT program includes orthodontic treatment "when medically necessary to correct handicapping malocclusion." CMS, State Medicaid Manual, § 5124.B.2.b (2005), available at http://www.cms.gov/Manuals/PBM/itemdetail.asp?filterType

---

[4]Throughout this opinion, we shall cite to the regulation in effect at the applicable time; in the instant case the applicable regulation is Tenn Comp. R. & Regs. 1200-13-13-.04. *See* Tenn. Comp. R. & Regs. 1200-13-13-.04 (Oct. 2007, Revised), available at http://www.tn.gov/sos/rules_archived/1200/1200-13/1200-13-13.20071011.pdf. The reader should take special note that the regulation at issue here differs from the regulation at issue in this court's opinion in a similar case, *Lee v. Emkes*, No. M2010-01909-COA-R3-CV, 2011 WL _____ , at * __ (Tenn. Ct. App. June __ 2011), which is filed concurrently with this opinion.

[5]Courts have held that the State Medicaid Manual is entitled to "respectful consideration in light of the agency's significant expertise, the technical complexity of the Medicaid program, and the exceptionally broad authority conferred upon the Secretary under the Act." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 591 n.6 (5th Cir. 2004) (citing *Wis. Dep't of Health & Family Servs. v. Blumer,* 534 U.S. 473, 497 (2002) (citing *United States v. Mead Corp.,* 533 U.S. 218 (2001); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504 (1994); *Schweiker v. Gray Panthers,* 453 U.S. 34, 43-44 (1981))).

=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS021927&intNumPerPage=10.

Tenn. Comp. R. & Regs. 1200-13-16-.05 (May 2007, Revised) defines medical necessity as follows:

(1) To be medically necessary, a medical item or service must satisfy each of the following criteria:

(a) It must be recommended by a licensed physician who is treating the enrollee or other licensed healthcare provider practicing within the scope of his or her license who is treating the enrollee;

(b) It must be required in order to diagnose or treat an enrollee's medical condition;

(c) It must be safe and effective;

(d) It must not be experimental or investigational; and

(e) It must be the least costly alternative course of diagnosis or treatment that is adequate for the enrollee's medical condition.[6]

TennCare's regulation addressing the coverage of orthodontic services for persons under the EPSDT program is set forth at Tenn. Comp. R. & Regs. 1200-13-13-.04(1)(b)6[7] and provides:

Orthodontic services must be prior approved and are limited to individuals under age 21 requiring these services for one of the following reasons:

(1) *because of a handicapping malocclusion or another developmental anomaly or injury resulting in severe misalignment or handicapping*

_____

[6]Available at http://www.tn.gov/sos/1200/1200-13/1200-13-16.20070515.pdf.

[7]Throughout their briefs, the parties refer to Tenn. Comp. R. & Regs. 1200-13-13-.04(1)(b)5. However, the appropriate regulation is Tenn. Comp. R. & Regs. 1200-13-13-.04(1)(b)6, as that was the regulation number at the time of the Final Administrative Order, and is the number cited in the Final Administrative Order.

*malocclusion of teeth*. The Salzmann Index will be used to measure the severity of the malocclusion. A Salzmann score of 28 will be used as the threshold value for making orthodontic determinations of medical necessity. In addition, individual consideration will be applied for those unique orthodontic cases that may not be accounted for solely by the Salzmann Index;

(2) following repair of an enrollee's cleft palate.

Orthodontic treatment will not be authorized for cosmetic purposes. Orthodontic treatment will be paid for by TennCare only as long as the individual remains eligible for TennCare.[8]

The definition of handicapping malocclusion is set forth at Tenn. Comp. R. & Regs. 1200-13-13-.01(40):

(40) Handicapping Malocclusion, for the purposes of determining eligibility under these regulations shall mean the presence of abnormal dental development that has at least one of the following:

(a) A medical condition and/or a nutritional deficiency with medical physiological impact, that is documented in the physician progress notes that predate the diagnosis and request for orthodontics. The condition must be non-responsive to medical treatment without orthodontic treatment.

(b) The presence of a speech pathology, that is documented in speech therapy progress notes that predate the diagnosis and request for orthodontics. The condition must be non-responsive to speech therapy without orthodontic treatment.

(c) Palatal tissue laceration from a deep impinging overbite

---

[8]The regulation further provides:

If the orthodontic treatment plan is approved prior to the enrollee's attaining 20 1/2 years of age, and treatment is initiated prior to the enrollee's attaining 21 years of age, such treatment may continue as long as the enrollee remains eligible for TennCare. The MCO is responsible for the provision of transportation to and from covered dental services, as well as the medical and anesthesia services related to the covered dental services.

Tenn. Comp. R. & Regs. 1200-13-13-.04(1)(b)6.

where lower incisor teeth contact palatal mucosa. This does not include occasional biting of the cheek.

Anecdotal information is insufficient to document the presence of a handicapping malocclusion. Anecdotal information is represented by statements that are not supported by professional progress notes that the patient has difficulty with eating, chewing, or speaking. These conditions may be caused by other medical conditions in addition to the misalignment of the teeth.[9]

In addition to federal and state regulations, TennCare's coverage of EPSDT services is covered by a federal judicial consent decree, which provides:

Defendants shall ensure that, within their respective spheres of responsibility, TennCare, the MCOs and DCS provide children all medically necessary EPSDT services as listed in 42 U.S.C. § 1396d(a) and as defined in corresponding Medicaid regulations.

*John B. v. Menke*, No. 98-0168, Consent Decree for Medicaid-Based Early and Periodic Screening, Diagnosis and Treatment Services (M.D. Tenn. Mar. 11, 1998), available at http://www.state.tn.us/tenncare/forms/johnb031198.pdf.

III.
<u>IS PETITIONER ENTITLED TO ORTHODONTIC TREATMENT</u>

Petitioner contends he is entitled to orthodontic treatment under the EPSDT program because it is medically necessary and that he was denied coverage based upon a regulation that violates federal law. Specifically, he contends that Tenn. Comp. R. & Regs. 1200-13-13.04(1)(b)6, which limits orthodontic treatment to persons with "*a handicapping malocclusion or another developmental anomaly or injury resulting in severe misalignment or handicapping malocclusion of teeth*," is in conflict with the EPSDT program and in violation of the Medicaid Act, 42 U.S.C. § 1396d(r)(5).

Conversely, the TDFA contends that TennCare correctly interpreted and applied its own regulations regarding the scope of TennCare coverage for orthodontic braces, and that the chancery court properly deferred to the agency's interpretation of its own rule. TDFA contends that there is nothing in the record or the cited law to support Petitioner's distinction

---

[9]While the parties refer to Tenn. Comp. R. & Regs. 1200-13-13-.01(51), the appropriate citation is Tenn. Comp. R. & Regs. 1200-13-13.01(40).

between a severe misalignment and a handicapping malocclusion, and claims that the term misalignment is used to explain the condition of a malocclusion. TDFA also contends that the interpretation contained within TennCare regulations, which provides orthodontic coverage for handicapping malocclusions, is consistent with federal law. In support of this, TDFA references the CSM State Medicaid Manual, which states that orthodontic treatment is provided when medically necessary to correct a handicapping malocclusion.

TDFA relies on two cases from different jurisdictions in support of its position, *Chappell v. Bradley*, 834 F. Supp. 1030 (N.D. Illinois 1993) and *Semerzakis v. Comm. of Social Servs.*, 873 A.2d 911 (Conn. 2005). In *Chappell*, the federal district court addressed whether Illinois's state medical assistance program violated federal law by failing to provide medically necessary orthodontic treatment to categorically needy children. Under Illinois's plan, orthodontic services were only provided to children with severe handicapping malocclusions and required prior approval before treatment. *Id*. at 1031. To determine whether a child had a severe handicapping malocclusion, the Salzmann Index was used, and a score of 42 was required for approval of orthodontic treatment, though prior approval was occasionally granted to individuals scoring below the threshold score. *Id*. at 1032. The plaintiffs in the class action lawsuit were two children, who had scored below the required Salzmann Index score of 42 and had been denied treatment for orthodontic braces. *Id*. The plaintiffs contended that the procedure used to determine whether orthodontic braces were covered, i.e. the Salzmann Index, resulted in the unlawful denial of medically necessary orthodontic treatment. *Id*. at 1034. The federal district court reasoned that the Illinois standard to determine eligibility would "pass muster" <u>if</u> the standard is "whether orthodontic treatment is medically necessary for the eligible child." *Id*. at 1035. If, however, "the standard is solely a Salzmann Index score of 42 without regard to the need for medical treatment, then there is [a] violation of the Medicaid Act."[10] *Id*. A subsequent order issued by the district court a month later to clarify its previous ruling stated:

> To comply with federal law the [Illinois Department of Public Aid] must authorize orthodontic treatment to all eligible patients having handicapping malocclusions severe enough to have a medical need for such orthodontic treatment. The IDPA need not provide orthodontic care to eligible patients having handicapping malocclusions if such conditions are not severe enough to have a medical need for such orthodontic treatment.

---

[10]These conclusions were stated in an order denying summary judgment. *Chappell*, 834 F. Supp. at 1031.

*Chappell v. Wright*,[11] No. 91-C-4572, 1993 WL 496700, at *1 (N.D. Ill. Nov. 24, 1993).

The reasoning in *Chappell* was relied upon by the Supreme Court of Connecticut in *Semerzakis v. Comm. of Social Services*, to determine whether the Connecticut state regulation limiting orthodontic treatment was a reasonable utilization control for EPSDT services pursuant to 42 U.S.C. § 1396d(r). *Semerzakis*, 873 A.2d at 913. In that case, a minor was denied coverage for orthodontic braces. *Id*. The Connecticut Department of Social Services, the state agency tasked with overseeing EPSDT services, used the Salzmann Assessment to determine whether orthodontic treatment was medically necessary and a Salzmann Index score of 24 was the threshold score for orthodontic treatment. *Id*. at 914-15. However, the department's regulations also stated that if a person's score was less than 24 "additional information of a substantial nature about the presence of severe mental, emotional, and/or behavior problems, disturbances or dysfunctions" should be considered. *Id*. (quoting Conn. Agencies Reg. § 17-134d-35(e)(1)). The plaintiff contended that 42 U.S.C. § 1396d(r)(5) requires that states provide such other necessary health care to correct or ameliorate defects, whether or not such services are covered under the state plan; therefore, the denial of the department for coverage of orthodontic braces was in violation of federal law. *Id*. at 916. The trial court agreed and found that the 42 U.S.C. § 1396d(r)(5) applied and that the department had established eligibility requirements that were stricter than authorized by the federal statute; however, the Connecticut Supreme Court reversed the trial court. *Id*.

The Connecticut Supreme Court found that 42 U.S.C. § 1396d(r)(5) did not apply and did not require a secondary medical necessity analysis "separate and apart from that proscribed by orthodontics regulation because dental services are not governed by that subdivision . . . dental services are governed specifically by subdivision (3) of § 1396d(r)(3)." *Id*. at 920. "In contrast to the general terms of subdivision (5) of § 1396d(r), subdivision (3) addresses EPSDT dental services with far greater specificity." *Id*. at 921 (citing 42 U.S.C. § 1396d(r)(3)(B) (dental services "shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health")). Thus, the *Semerzakis* court found that "subdivision (5) of § 1396d(r) is inapplicable to those medical services that are addressed expressly in the other subdivisions of the statute, namely, vision, hearing and dental services." *Id*. (citing 42 U.S.C. § 1396d(r)(2), (3), (4)). The court also concluded that a determination of medical necessity was not abrogated by the inapplicability of subdivision (5) stating "*medical necessity remains the touchstone for the provision of services under either subdivision (5) of § 1396d(r) or subdivision (3).*" *Id*. (emphasis added). The court further noted that "[t]here is nothing in the text or legislative history of subdivision (5) that

---

[11]The name of the parties in the case differed in the court's second order as a new director of the Illinois Department of Public Aid had been named.

precludes states from using utilization controls to determine whether requested services are medically necessary." *Id*. (citing H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 399 (1989), reprinted in 1989 U.S.S.C.A.N. 1906, 2125).

Having found that only subdivision (3) applied, the *Semerzakis* court next examined whether the state regulation on orthodontic treatment was invalid as an eligibility requirement that was more restrictive than the federal medicaid statutes and regulations permitted. *Id*. at 922. The plaintiff contended that the use of the Salzmann Index to determine medical necessity was inappropriate because it rendered "useless" the additional prongs of the regulation that allowed for additional inquiries. *Id*. at 923. The Connecticut Supreme Court found that the orthodontics regulation was "valid as a reasonable utilization control that does not cause recipients to receive less care than was envisioned by § 1396d(r)(3)." In making its decision, the court reasoned that the Salzmann Index was not being used as a bright line determination, as "a score of less than twenty-four will not necessarily result in the denial of orthodontic services because the orthodontics regulation provides two opportunities for additional consideration of individual case." *Id*. at 925-26. The court emphasized the fact that "the meaningful consideration of recipients' individual circumstances is a key factor in the validity of the regulation under the federal EPSDT statutes and regulations." *Id*. at 927 (citing *Chappell*, 834 F.Supp. 1034; *Jacobus v. Dept. of PATH*, 857 A.2d 785, 790-92 (Vt. 2004)). The court further found that in order for the state regulation not to fall into "fatal conflict with the federal EPSDT statutes and regulations," the regulation must require the consideration of "additional information of [a] substantial nature about the presence of [any] severe deviations affecting the mouth and underlying structures regardless of whether they were included in the Salzmann Assessment." *Id*. (alterations in original). Based upon this, the *Semerzakis* court determined that the Connecticut regulation was a "reasonable attempt to balance objectively orthodontics as an option that may be desirable primarily for aesthetic reasons on the one hand, and orthodontics as a medically necessary method of treating significant malocclusions." *Id*. at 928 (citing *Beal v. Doe*, 432 U.S. 438, 444-45 (1977)).

As the foregoing analysis reveals, states *are* permitted to place reasonable utilization controls on the EPSDT services provided by the state regarding the amount, duration, and scope of the services. 42 C.F.R. § 440.230(d) (providing states are permitted to "place appropriate limits on a service based upon such criteria as medically necessity or on utilization control procedures); *see also Semerzakis*, 873 A.2d at 919 (citing CMS State Medicaid Manual, § 5122, p. 5-10). These limitations, however, must be "reasonable and services must be sufficient to achieve their purpose." *Semerzakis*, 873 A.2d at 919. As recognized in *Semerzakis*, the issue of orthodontic treatment requires a balancing between treatment for cosmetic purposes and the need for treatment when it is medically necessary. *Id*. at 928. Thus, when utilization controls, such as the Salzmann Index are used, the state regulations must also, indeed *shall*, take into account the individualized circumstances of

each case in order to determine medical necessity, the Salzmann score notwithstanding. *Id*. at 927. As *Chappell* and *Semerzakis* emphasized, an individualized assessment of medical necessity is essential for a state regulation to comply with the federal statutes and regulations.[12] *See Chappell*, 834 F. Supp. 1034; *see also Semerzakis*, 873 A.2d at 927.

As our analysis reveals, states are not required to provide orthodontic treatment in every scenario; to the contrary they are allowed to place reasonable utilization controls on the coverage of orthodontic treatment under the EPSDT program. 42 C.F.R. § 440.230(d); *Semerzakis*, 873 A.2d at 919. Pursuant to Tenn. Comp. R. & Reg. 1200-13-13-.04(b)6 and Tenn. Comp. R. & Regs. 1200-13-13-.01(40), the State of Tennessee authorizes TennCare enrollees to obtain orthodontic treatment if a handicapping malocclusion is present to treat a medical condition, nutritional deficiency, speech problem, or palatal tissue laceration. Moreover, as is required by the federal regulations and Medicaid Act, Tennessee also assures that, although the Salzmann Index will be used to measure the severity of a malocclusion for threshold orthodontic determinations of medical necessity, "[i]n addition, individual consideration will be applied for those unique orthodontic cases that may not be accounted for solely by the Salzmann Index." Tenn. R. & Regs. 1200-13-13-.04(1)(b)6. We, therefore, conclude that the Tennessee regulations at issue are not in violation of federal law. Moreover, although Petitioner did not meet the Salzmann Index threshold, there was an additional individualized consideration (assessment) of Petitioner's need for orthodontic treatment; in fact there was more than one assessment, and there is no finding and no evidence that Petitioner suffers from a misalignment that causes a medical condition, nutritional deficiency, speech problem, or palatal tissue laceration, being the conditions that require orthodontic treatment or braces as a medically necessity pursuant to the Tennessee regulations.

As we noted earlier in this opinion, judicial review of decisions of administrative agencies acting within their area of specialized knowledge, experience, and expertise, is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h). *Willamette Indus., Inc.,* 11 S.W.3d at 147. Moreover, the courts may only reverse or modify the decision of the agency if the petitioner's/appellant's rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are in violation of constitutional or statutory provisions, the decision is in excess of the statutory authority of the agency, the decision is made upon unlawful procedure, it is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or the decision is

---

[12]For example, if an alignment or malocclusion is not "severe" in that it does not cause difficulty breathing or eating, but the child suffers from significant mental health problems as a result, the court in *Semerzakis* recognized that this could constitute a medical necessity, and because the regulations provided a means to account for such circumstances, they did not conflict with federal regulations. *Semerzakis*, 873 A.2d at 927-28.

unsupported by evidence which is both substantial and material in the light of the entire record. Tenn. Code Ann. § 4-5-322(h)(1)-(5). Having conducted a thorough review of this matter, and recognizing that we may not substitute our judgment for that of the administrative agency concerning the weight of the evidence as to questions of fact, *see* Tenn. Code Ann. § 4-5-322(h)(5)(B); *see also Humana of Tennessee*, 551 S.W.2d at 668, we find no basis to disturb the decision of the trial court or that of the administrative agency.

### In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Appellant.

_____
FRANK G. CLEMENT, JR., JUDGE